UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Chrysler Group LLC,

      Plaintiff,

v.                                                        Case No. 10-12984

South Holland Dodge, Inc., *et al.,*                      Honorable Sean F. Cox

      Defendants;

           *Consolidated with*

Livonia Chrysler Jeep, Inc., a Michigan
for profit corporation,

      Plaintiff,
v.                                                        Case No. 10-13290

Chrysler Group, LLC, *et al.*,                            Honorable Sean F. Cox

      Defendants;

           *Consolidated with*

Chrysler Group LLC,

      Plaintiff,

v.                                                        Case No. 10-13908

Sowell Automotive, Inc., *et al.*,                        Honorable Sean F. Cox

      Defendants.
_____/

## **OPINION & ORDER**

This matter is currently before the Court on motions to dismiss filed by five Defendants.

1

In these motions, the Moving Defendants: 1) challenge this Court's exercise of personal jurisdiction over them; 2) challenge venue; 3) raise standing and ripeness challenges; 4) assert that service was improper as to one Moving Defendant; and 5) assert that this Court should dismiss two Moving Defendants, or require Chrysler Group LLC to add three other existing dealers as defendants, because those three dealers are necessary parties. The parties have fully briefed the issues and the Court finds that oral argument would not significantly aid the decisional process. *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. The Court therefore orders that the motions will be decided upon the briefs. For the reasons that follow, the Court concludes: 1) that it may exercise personal jurisdiction over the Moving Defendants; 2) that venue is proper in this district; 3) that Chrysler Group LLC has standing and that the issues are ripe for a determination by this Court; and 4) that Defendant Sowell was properly served. In addition, the Court concludes that Defendants Boucher and Braeger have shown that three existing non-party dealers are necessary parties to this action and that CG must therefore add them as parties within 14 days or dismiss Boucher and Braeger from this action.

BACKGROUND

This case has a rather lengthy and unusual background, which is relevant to the various issues presented in the pending motions.

A.    <u>Various State Dealership Acts Provide Certain Protections For Existing Dealers And Allow Them To Challenge A Manufacturer's Decision To Establish Or Relocate Another Dealer Into A Given Area.</u>

Various state dealership acts provide certain protections for existing dealers and allow them to challenge a manufacturer's decision to establish or relocate another dealer into a given area.

2

For example, in 1981, Michigan enacted M.C.L. § 445.1561 *et seq*. ("the Michigan Dealer Act").  Among other things, the Michigan Dealer Act provides protections for existing dealers.  It regulates a manufacturer's establishment or relocation of a dealership within a relevant market area where the same line make is already represented.  *See* M.C.L. § 445.1566 & § 445.1576.  Before a manufacturer can establish or relocate a dealer into a relevant market area ("RMA"), the manufacturer must do certain things – such as give written notice to existing dealers within the RMA of its intention to establish or relocate another dealer to the RMA.  Those existing dealers can then challenge that action by filing a declaratory action in circuit court, to determine if good cause exists for the establishment or relocation of the dealer.

While the dealer acts in each state differ in various respects, they provide similar protections to existing dealers.  Automotive manufacturers and dealers have been operating under these state dealer acts for decades.

B.      Each Of The Moving Defendants Operated Under Dealer Agreements With Chrysler LLC ("Old Chrysler").

John D. Tangeman was Chrysler LLC's National Dealer Placement Manager and was responsible for overseeing its national network of Chrysler, Jeep, and Dodge dealers.  (Tangeman Affidavit at ¶ 4).

Sowell Automotive, Inc. ("Sowell") is a California Corporation that operated a Chrysler dealership in California.  Sowell entered into Sales and Service Agreements ("the Sowell Dealer Agreements") with Chrysler LLC ("Old Chrysler") in 1995.  (*See* Exs. A, B & C to D.E. 126-2).  Under those agreements, Sowell was authorized to order new Chrysler, Jeep, and Dodge vehicles, and related parts and accessories, from Old Chrysler and sell them at retail to its

3

customers.  (*Id.*; Tangeman Affidavit at ¶ 6).  Old Chrysler's principal place of business was in Michigan.  (*Id.*).  The Sowell Dealer Agreements were finally executed by Old Chrysler in Michigan and, by their terms, were governed by Michigan law.  (*Id.*).  Sowell operated as a Chrysler, Jeep, and Dodge dealer under the Sowell Dealer Agreements for over 14 years. (Tangeman Affidavit at ¶ 7).

Boucher Imports, Inc. ("Boucher") and Braeger Chrysler Jeep ("Braeger") are Wisconsin corporations that operated Chrysler dealerships in Wisconsin.  Boucher and Braeger each entered into Sales and Service Agreements ("the Boucher and Braeger Dealer Agreements") with Old Chrysler.  (*See* Exs. A & B to D.E. 125-2).  Under those agreements, they were authorized to order new Chrysler, Jeep, and Dodge vehicles, and related parts and accessories, from Old Chrysler and sell them at retail to its customers.  (*Id.*; Tangeman Affidavit, D.E. 125-2).  Old Chrysler's principal place of business was in Michigan.  The Boucher and Braeger Dealer Agreements were finally executed by Old Chrysler in Michigan and, by their terms, were governed by Michigan law.  (*Id.*).  Boucher and Braeger each operated as a Chrysler, Jeep, and Dodge dealer under those Agreements for 17 years.  (*Id.*).

BGR, LLC, doing business as Deland Dodge ("Deland") is a Florida limited liability company that operated a Chrysler dealership in Florida.  Deland entered into Sales and Service Agreements ("the Deland Dealer Agreements") with Old Chrysler.  (D.E. 135-2).  Under those agreements, Deland was authorized to order new Chrysler, Jeep, and Dodge vehicles, and related parts and accessories, from Old Chrysler and sell them at retail to its customers.  (Tangeman Affidavit, D.E. 135-2).  Old Chrysler's principal place of business was in Michigan.  The Deland Dealer Agreements were finally executed by Old Chrysler in Michigan and, by their terms, were

4

governed by Michigan law.  Deland operated as a Chrysler, Jeep, and Dodge dealer under the
Deland Dealer Agreements for 4 years.  (*Id*.).

Jim Marsh American Corporation ("Jim Marsh") is a Nevada corporation that operated a
Chrysler dealership in Nevada.   Jim Marsh entered into Sales and Service Agreements ("the Jim
Marsh Dealer Agreements") with Old Chrysler.  (*See* D.E. 171-2).  Under those agreements, Jim
Marsh was authorized to order new Chrysler, Jeep, and Dodge vehicles, and related parts and
accessories, from Old Chrysler and sell them at retail to its customers.  (Tangeman Affidavit,
D.E. 171-2).  Old Chrysler's principal place of business was in Michigan.  The Jim Marsh Dealer
Agreements were finally executed by Old Chrysler in Michigan and, by their terms, were
governed by Michigan law.  Jim Marsh operated as a Chrysler, Jeep, and Dodge dealer under the
Jim Marsh Dealer Agreements for 9 years.  (*Id*.).

During the time that the Moving Defendants were operating under their respective Dealer
Agreements with Old Chrysler:

- Each of the Moving Defendants submitted "literally thousands" of orders to Old
  Chrysler's offices in Michigan for new vehicles, parts and accessories, and Old Chrysler
  sold new vehicles, parts and accessories to them, pursuant to their Dealer Agreements.

- The Dealer Agreements allowed the Moving Defendants to use Chrysler's trademarks,
  trade names and insignias, and each of the Moving Defendants displayed such
  trademarks, trade names or insignias at its business.

- The Dealer Agreements also obligated Old Chrysler to make payments to the Moving
  Defendants for warranty service or campaign inspections if claimed by them in
  accordance with Old Chrysler's policies and procedures.  The Moving Defendants each
  submitted such claims, as well as claims for incentive payments, to Old Chrysler
  personnel in Michigan and accepted payments from Old Chrysler relating to such claims.

- The Dealer Agreements further required each of the Moving Defendants to submit
  various reports to Old Chrysler personnel in Michigan including sales and stock reports

5

and monthly financial statements and operating reports, and the Moving Defendants
submitted such reports to Old Chrysler personnel in Michigan.

- The contractual relationship between Old Chrysler and each of the Moving Defendants
  necessitated frequent and regular communications between each of the Moving Defendant
  and Old Chrysler personnel in Auburn Hills, Michigan.

(*See* Tangeman Affidavits).

C.    Old Chrysler's Bankruptcy Proceedings Resulted In 2,400 Dealer Agreements Being
      Assigned To A Newly Formed Entity, CG, And Old Chrysler Rejecting The Remaining
      789 Dealership Agreements.

During the recent economic decline, the automotive industry was hit hard.  This resulted

in unprecedented bankruptcy filings by Chrysler LLC and certain of its subsidiaries ("Old

Chrysler") in April 2009, and by General Motors ("Old GM") in June 2009.  While both of these

manufacturers consolidated their nationwide dealer networks in connection with these

proceedings, they handled things differently with respect to assignment of dealer agreements.

During its bankruptcy proceedings, Old GM assigned substantially all of its dealer

agreements to a new legal entity, General Motors LLC ("New GM").

On April 30, 2009, Old Chrysler filed a voluntary petition for relief in the Bankruptcy

Court under Chapter 11 of the Bankruptcy Code.  Rather than liquidate, it sold substantially all of

its assets to a newly formed entity by Fiat S.p.A., that ultimately became known as Chrysler

Group LLC ("CG").  The terms of this transaction were memorialized in a Master Transaction

Agreement among Old Chrysler, Fiat and CG.  It provided, among other things, that Old Chrysler

would transfer substantially all of its operating assets to the newly formed CG, including the

assignment of approximately 2,400 dealer agreements.  The remaining 789 dealer agreements

were excluded from the assets purchased.  The Bankruptcy Court approved the sale under the

6

Purchase Agreement.

In addition, during the Bankruptcy proceeding, Old Chrysler sought authorization to reject the remaining 789 dealer agreements. The Bankruptcy Court approved the rejection of those dealer agreements. The Sowell Dealer Agreement, the Boucher & Braeger Dealer Agreements, the Deland Dealer Agreements, and the Jim Marsh Dealer Agreements were all rejected.

Prior to the rejection of its dealer agreement, Sowell had operated as a Chrysler, Jeep, and Dodge dealer for over 14 years. (Tangeman Affidavit at ¶ 7). Similarly, prior to the rejection of their dealer agreements, Boucher and Braeger had so operated for 17 years, Deland had so operated for 4 years, and Jim Marsh had so operated for 9 years.

D.    Section 747 Is Enacted On December 16, 2009, And Gives Rejected Dealers Certain Arbitration Rights.

On December 16, 2009, Congress enacted the Consolidated Appropriations Act, 2010 Pub. L. No. 111-117 ("Section 747").

Section 747 provides that a "covered dealership that was not lawfully terminated under applicable State law on or before April 29, 2009, [the day before Old Chrysler filed its bankruptcy petition], shall have the right to seek, through binding arbitration, continuation, or reinstatement of a franchise agreement, or to be added as a franchisee to the dealer network of the covered manufacturer in the geographical area where the covered dealership was located when its franchise agreement was terminated, not assigned, not renewed, or not continued."

Section 747 provides that "[t]he arbitrator shall balance the economic interest of the covered dealership, the economic interest of the covered manufacturer, and the economic interest

7

of the public at large and shall decide, based on that balancing, whether or not the covered

dealership should be added to the dealer network of the covered manufacturer."  Section 747 lists

various factors that the arbitrator should consider.

It further provides that "[t]he arbitrator shall issue a written determination no later than 7

business days after the arbitrator determines that the case has been fully submitted.  At a

minimum, the written determination shall include (1) a description of the covered dealership; (2)

a clear statement indicating whether the franchisee agreement at issue is to be renewed,

continued, assigned or assumed by the covered manufacturer; (3) the key facts relied upon by the

arbitrator in making the determination, and (4) an explanation of how the balance of economic

interests supports the arbitrator's determination."

Section 747 provides that the "arbitrator shall not award compensatory, punitive, or

exemplary damages to any party.  If the arbitrator finds in favor of a covered dealership, the

covered manufacturer shall as soon as practicable, but not later than 7 days after receipt of the

arbitrator's determination, provide the dealer a customary and ususal letter of intent to enter into

a sales and service agreement."

E.    Several Rejected Dealers Prevailed In Section 747 Arbitrations And Those Arbitration
      Rulings Have Given Rise To This Litigation.

Because they had each operated under Dealer Agreements with Old Chrysler, each of the

Moving Defendants was permitted to seek arbitration under Section 747 and did so.

Pursuant to the express terms of Section 747, those arbitrations took place in the state

where each of the Moving Defendant's dealership was located.  (*See* Section 747, providing that

the "arbitration shall be conducted in the State where the covered dealership is located.").

8

All of the Moving Defendants were among the 32 dealers across the nation that prevailed in Section 747 arbitrations.[1]

The instances in which dealers prevailed in Section 747 arbitrations have given rise to this litigation because CG, the prevailing dealers, and other interested existing dealers, disagree as to what happens next following those arbitration rulings.

In sum, CG asserts that Section 747's sole and exclusive remedy is that the prevailing dealer receives a customary and usual letter of intent ("LOI") from CG.  CG contends that it has provided prevailing dealers with the required LOI's and that, under applicable state dealer acts, the former dealers have to go through the normal steps that a new dealer would have to go through (i.e., other interested dealers would be able to oppose the establishment or relocation of that dealer ).  CG contends that Section 747 does not preempt state dealer acts.  CG further contends that Section 747 does not authorize a dealer to be "reinstated" and that any "reinstatement" could not result here in any event because these dealers never had a dealer agreement with CG.

The prevailing dealers disagree.  Some prevailing dealers contend that Section 747 preempts state dealer acts or that the dealer acts do not apply to them.  Many contend that the LOI's they received from CG are deficient and/or insufficient under Section 747.  Some contend that, under Section 747, they are entitled to be "reinstated" and are entitled to be placed in the

---

[1]CG states that over 400 of Old Chrysler's former dealers, whose dealer agreements were rejected by order of the Bankruptcy Court, elected to arbitrate under Section 747.  (CG's Motion to Consolidate, D.E. No. 25 at 3).  CG further states that it prevailed in 76 of those arbitrations, that it did not prevail in 32 of those arbitrations, and that the remaining arbitrations were otherwise resolved.

same position they were in before their franchise terminated.

Other interested existing dealers have threatened to sue CG if CG establishes or relocates a dealer who prevailed in a Section 747 arbitration into their area without following the state dealer act provisions.

F.   Each Of The Moving Defendants Interacted With CG In Michigan Following The Arbitration Rulings.

John Tangeman, who was Old Chrysler's National Dealer Placement Manager, is CG's National Placement Manager.  He is still responsible for overseeing the national network of Chrysler, Jeep and Dodge Dealers.  Tangeman is authorized to approve and execute sales and service agreements ("Dealer Agreement") with dealers on CG's behalf.  (Tangeman Affidavits).  He is also responsible for the preparation of CG's form of letter of intent ("LOI") that CG enters into with potential dealer candidates that have requested a Dealer Agreement.  (*Id*.).  He is authorized to approve and sign LOIs on CG's behalf.  (*Id*.).  Each form of CG's LOI, "whether sent to a dealer candidate uninvolved in arbitration, or to a 'rejected dealer' that prevailed in Section 747 arbitration, was governed by Michigan law."  (*Id*.).  The sales and service agreements that the Moving Defendants seek to enter into with CG, as referred to in the LOIs, would be executed by CG in Michigan and would have similar provisions and obligations as the agreements the Moving Defendants had with Old Chrysler.  (*Id.*).

One of the Moving Defendants, Sowell, refused to sign the LOI provided by CG.  On or about June 3, 2010, Tangeman caused a letter to be sent to Sowell enclosing a LOI from CG.  (Tangeman Affidavit at ¶ 16; Ex. F to D.E. 126-2).  Sowell, however, notified CG that it objected to the LOI, claiming that it was not CG's customary and usual letter of intent.  (*Id*. at ¶ 17).

10

"Sowell requested from [CG] personnel in Michigan that certain modifications be made to the LOI.  Sowell initiated contact with [Tangeman] objecting to the terms of the LOI and attempting to persuade [CG] to either change the allegedly objectionable terms or give Sowell a monetary settlement."  (*Id*. at ¶ 18; Ex. G to D.E. 126-2).  "The negotiations initiated by Sowell ultimately were not successful," and "Sowell has refused to sign the LOI provided to it."  (Tangeman Affidavit at ¶ 19).

The other Moving Defendants signed the LOIs provided to them by CG and returned them to CG in Michigan.

On or about May 7, 2010, Tangeman caused a letter to be sent to Deland, enclosing a LOI from CG.  (D.E. 135-2).  Deland signed the LOI provided by CG.  (*Id.* at ¶ 17).

In July of 2010, Tangeman caused a letter to be sent to Jim Marsh, enclosing a LOI from CG.  (Tangeman Affidavit).  Soon thereafter, Jim Marsh executed and returned the LOI to CG.  Tangeman then executed the LOI on behalf of CG in Michigan.  (*Id*.).

In July of 2010, Tangeman caused letters to be sent to Boucher and Braeger, enclosing LOI's.  After receiving them, Braeger and Boucher executed CG's LOIs and returned them to CG.  (Tangeman Affidavit, D.E. 125-2).  The sales and service agreements that Braeger and Boucher seek to enter into with CG, "as referred to explicitly in the LOI that Braeger and Boucher signed, would be executed by [CG] in Michigan and governed by the laws of Michigan.  These sales and service agreements with [CG] would have similar provisions and obligations as the sales and service agreements that Braeger and Boucher had with Old Chrysler."  (*Id*.).

G.  <u>There Were Three Actions Pending Before This Court, Which This Court Consolidated.</u>

CG filed Case No. 10-12984 on July 28, 2010.  This is a declaratory action that was filed

11

in this Court by CG against two groups of Defendants: 1) a number of rejected dealers (from Michigan and Illinois) who prevailed in Section 747 arbitrations and obtained LOI's from CG; and 2) existing like-line dealers who have threatened to sue CG to prevent the establishment of dealerships (for the rejected dealers) in their areas.  Some rejected dealers have, in turn, filed counterclaims seeking declaratory relief consistent with their positions.

Case No. 10-13290 was filed in this Court on August 19, 2010.  In that case, one rejected dealer (Livonia Chrysler Jeep, Inc.) filed suit against CG and against a surviving dealer (Crestwood Dodge, Inc.) who was allegedly given a dealership in the same locale after it was rejected. CG has filed a counterclaim seeking declaratory relief consistent with its position on the issues.

CG filed Case No. 10-13908 in this Court on September 30, 2010.  Like Case No. 10-12984, CG filed this declaratory action against rejected dealers and like-line dealers, who are located outside of Michigan (Colorado, Montana, Ohio and Wisconsin), seeking the same declaration its seeks in the initial case.  On October 3, 2010, CG filed an Amended Complaint, adding additional Defendants, including Sowell.  After consolidation, CG filed a Second Amended Complaint adding Marsh and another dealer.

All three of the above actions were consolidated in this Court's Order dated December 17, 2010.  (D.E. 92).  Upon consolidating the cases, the Court made several rulings regarding early motion practice and discovery.

This Court ordered that the parties may file motions to dismiss based on personal jurisdiction, subject matter jurisdiction, improper venue, insufficient process, insufficient service of process, or failure to join a party under Rule 19 at any time.

12

The Court further ordered that, because the same threshold legal issues impact all parties, the Court would hear and determine all motions to dismiss based on failure to state a claim upon which relief can be granted (and summary judgment motions filed prior to discovery) at the same time.  The Court further ordered that it would hear and determine all motions to dismiss before any discovery commences.  The Court advised that it would set a briefing schedule for the filing of motions to dismiss based on failure to state a claim upon which relief can be granted (and summary judgment motions filed prior to discovery) at a status conference that would be held after the Government determined whether or not it would seek to intervene in this action in order to defend the constitutionality of Section 747.  The Government has since intervened and the Court set a June 6, 2011 deadline for filing motions to dismiss for failure to state a claim and motions for summary judgment filed prior to discovery.

The Court also ruled that it would not consider any motions to transfer venue pursuant to 28 U.S.C. § 1404(a) until after the Court's determination on the threshold substantive legal issues in this action.

H.    Related Cases Filed In Other Jurisdictions:

As shown below, cases involving CG and the Moving Defendants have been filed in other jurisdictions.

After Deland prevailed in a Section 747 arbitration, it received a LOI from CG in May of 2010.  On July 1, 2010, Deland filed an "Application for Confirmation of Written Determination of Arbitrator" in Florida state court.  In that application, Deland sought confirmation of the award and requested an order that it should be "unconditionally" added to CG's roster of dealerships. (D.E. 121-3 at 4).  CG removed the action to federal court in Florida, but the federal court

13

remanded the action to state court after finding that a federal question was not presented on the face of the complaint. (D.E. 121-4 at 4).

On or about October 8, 2010, CG filed a Complaint for Declaratory Judgment in Wisconsin state court. In that action, Boucher & Braeger have asserted, as an affirmative defense, that Section 747 preempts state dealership acts.

On October 26, 2010 – after it was already a Defendant in this action – Sowell filed suit against CG in the Central District of California. (*See* Ex. 7 to D.E. 126). In that action, Sowell seeks: 1) a declaration that the LOI issued by CG was not customary and usual and violates Section 747; 2) an injunction requiring CG to issue it a proper LOI and a dealer agreement; and 3) damages and other relief for alleged violations of California's Vehicle Code.

I.    The Pending Motions:

The following Defendants filed motions to dismiss based on personal jurisdiction, subject matter jurisdiction, improper venue, insufficient process, insufficient service of process, and/or failure to join a party under Rule 19: 1) Boucher and Braeger (D.E. 100); 2) Sowell (D.E. 111); 3) Deland (D.E. 121); and 4) Jim Marsh (D.E. 156).[2]

ANALYSIS

I.    Challenges To Personal Jurisdiction:

CG bears the burden of establishing that this Court has personal jurisdiction over each Defendant. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

---

[2]Defendants South Holland Dodge, Stadium Auto Mall Sales, Inc., and Rimrock Chrysler, Inc. also filed Motions to Dismiss but they were each later voluntarily dismissed from this action.

Here, Defendants Boucher, Braeger, Sowell, B.G.R., and Jim Marsh challenge personal jurisdiction.

Where, as here, a district court "relies solely on written submission and affidavits to resolve a Rule 12(b)(2) motion, rather than resolving the motion after either an evidentiary hearing or limited discovery, the burden on the plaintiff is 'relatively slight,' *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988), and 'the plaintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal.'" *Air Products and Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007). "In that instance, the pleadings and affidavits submitted must be viewed in a light most favorable to the plaintiff, and the district court should not weigh 'the controverting assertions of the party seeking dismissal.'" *Id.*

Personal jurisdiction over an out-of-state defendant arises from certain minimum contacts with the forum state such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"Depending on the type of minimum contacts in a case, personal jurisdiction can either be specific or general." *Air Products and Controls, Inc.*, 503 F.3d at 550. General jurisdiction depends on a showing that the defendant has continuous and systematic contacts with the forum state to justify the state's exercise of judicial power with respect to any and all claims the plaintiff may have against the defendant. *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997). Specific or limited personal jurisdiction "exposes the defendant to suit in the forum state only on claims that 'arise out of or relate to' a defendant's contacts with the

forum.  *Id.*

Here, CG does not contend that general jurisdiction exists over the Moving Defendants. Rather, it asserts that specific jurisdiction exists over the Moving Defendants.

A district court's analysis of personal jurisdiction generally entails two steps: 1) first, the court must determine whether any of Michigan's relevant long-arm statutes authorize the exercise of jurisdiction over Defendants; and, if so, 2) the court must determine whether the exercise of that jurisdiction comports with constitutional due process.  *Id.*

A.    Does Michigan's Long-Arm Statute Authorize Jurisdiction?

CG asserts that this Court has specific or limited jurisdiction over the Moving Defendants because this action arises out of the Moving Defendants' "transaction of any business within the state" under M.C.L. § 600.715(1).  The Court agrees.

The first statutory criterion for finding limited personal jurisdiction under this prong of Michigan's long-arm statute requires the "transaction of any business within the state."  *Id.*  The word "any" includes "each" and "every," and comprehends even the "slightest" amount of business.  *Lanier v. American Bd. of Endodontics,* 843 F.2d 901, 906 (6th Cir. 1988).  Thus, if the Moving Defendants conducted even the slightest act of business in Michigan, the above statutory criterion for personal jurisdiction is met.  Moreover, neither the presence of the defendant in the state, nor the actual contract formation need take place in the forum state for the defendant to do business in that state.  *Id.*

Here, the Moving Defendants' contacts with CG in negotiating and/or signing LOIs were for the purpose of establishing – or re-establishing – a long-term business relationship with a Michigan-headquartered company that would allow them to sell Chrysler-branded vehicles.

16

Thus, the Court concludes that Michigan's long-arm statute authorizes limited jurisdiction over the Moving Defendants.

B.      Does Exercise Of Jurisdiction Comport With Due Process?

The Sixth Circuit has established a three-part test for determining whether the exercise of jurisdiction comports with due process:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). While these criteria are helpful, courts are not to "apply them mechanically because the inquiry into whether jurisdiction exists turns on the facts of the individual case at hand." *Chrysler Corp. v. Uptown Motorcars-Hartford, Inc.*, 173 F.3d 854, 1999 WL 196558 (6th Cir. 1999).

1.      The Purposeful Availment Requirement:

The purposeful availment requirement is satisfied when the defendant's contacts with the forum state create a substantial connection with the forum state and when the defendant's conduct and connection with the forum are such that he "should reasonably anticipate being haled into court there." *Compuserve, Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir. 1996). Purposeful availment is required to insure that "random," "fortuitous," or "attenuated" contacts do not cause a defendant to be haled into a jurisdiction. *Id*.

"In describing when a party has purposefully directed its activities toward the forum state, the Supreme Court in *Burger King* stated that 'with respect to interstate contractual obligations,

17

we have emphasized that parties who reach out beyond one state and create continuing

relationships and obligations with citizens of another state are subject to regulation and sanctions

in the other State for the consequences of their activities.'" *Id*. (Quoting *Burger King Corp. v.

Rudzewski*, 471 U.S. 462, 473 (1985)).

The purposeful availment requirement "does not, however, mean that a defendant must be

physically present in the forum state.  As the *Burger King Corp.* Court stated, 'So long as a

commercial actor's efforts are 'purposefully directed' toward residents of another State, we have

consistently rejected the notion that an absence of physical contacts can defeat personal

jurisdiction there.'" *Compuserve, Inc*., 89 F.3d at 1264 (quoting *Burger King Corp.,* 471 U.S. at

476).

The existence of a contract with a resident of the forum, by itself, is not a sufficient basis

for this Court to exercise jurisdiction over a defendant.  *Burger King Corp.*, 471 U.S. at 478.

The *Burger King* Court "rejected a 'mechanical' approach which would find jurisdiction based

solely on the existence of a contract with an out-of-state party in favor of a 'highly realistic'

approach that looks to the negotiations, contemplated future consequences, the terms of the

contract, and the course of dealing between the parties." *Chrysler Corp. v. Uptown Motorcars-

Hartford, Inc.*, *supra*, at *4 (Quoting *Burger King*, 471 U.S. at 478-79).  This highly realistic

approach "recognizes that a 'contract' is ordinarily but an intermediate step serving to tie up prior

business negotiations with future consequences which themselves are the real object of the

business transaction." *Burger King*, 471 U.S. at 479.

Here, each of the moving Defendants entered into written Dealer Agreements with Old

Chrysler.  Old Chrysler's principal place of business was in Michigan.  Each of those Dealer

Agreements were finally executed by Old Chrysler in Michigan and, by their terms, were governed by Michigan law.  By entering into those Dealer Agreements, the Moving Defendants reached out to create a continuing relationship with Old Chrysler.  The "real object" of those Dealer Agreements with Old Chrysler was to allow each of the Moving Defendants to operate a Chrysler franchise.

Indeed, after entering into those Dealer Agreements, each of the Moving Defendants operated a Chrysler franchise for several years.  While operating those Chrysler franchises: 1) each of the Moving Defendants submitted "literally thousands" of orders to Old Chrysler's offices in Michigan for new vehicles, parts and accessories; 2) the Moving Defendants used Chrysler's trademarks, trade names and insignias, and displayed such trademarks, trade names or insignias at their businesses; 3) the Moving Defendants each submitted claims for warranty service or campaign inspections, and claims for incentive payments, to Old Chrysler personnel in Michigan and accepted payments from Old Chrysler relating to such claims; 4) the Moving Defendants submitted reports, including sales and stock reports and monthly financial statements and operating reports, to Old Chrysler personnel in Michigan; and 5) the Moving Defendants had frequent and regular communications with Old Chrysler personnel in Auburn Hills, Michigan.

If Old Chrysler had sued the Moving Defendants alleging a breach of those Dealer Agreements, this Court could exercise personal jurisdiction over the Moving Defendants, based on the above contacts, under *Chrysler Corp. v. Uptown Motorcars-Hartford, Inc.*, 173 F.3d 854, 1999 WL 196558 (6th Cir. 1999).

While Old Chrysler terminated the Dealer Agreements with the Moving Defendants, each of the Moving Defendants took actions to purposefully perpetuate or re-establish their franchise

19

relationships.  After Old Chrysler terminated the agreements, each of the Moving Defendants contacted CG in Michigan, demanding arbitration under Section 747, seeking to obtain a letter of intent to enter into a sales and service agreement from CG.  That is, each of the Moving Defendants contacted CG to demand arbitration, seeking to obtain a LOI, and ultimately to obtain a Dealer Agreement with CG to allow them to operate a Chrysler franchise at their previous locations.  Thus, the real object of the Moving Defendants' arbitration demands, and the real object of the LOIs sought by the Moving Defendants, is the right to operate a Chrysler franchise.

After prevailing in those Section 747 arbitrations, CG prepared LOIs and sent them to each of the Moving Defendants.  Each of the LOIs provided expressly states that it is governed by Michigan law and that it will be executed by CG in Michigan.

With the exception of Sowell, each of the Moving Defendants then signed the LOI issued to them and returned them to CG in Michigan.  Sowell did not sign and return the LOI to CG but contacted CG in Michigan to request that modifications be made to the LOIs provided to them. Sowell requested from CG personnel in Michigan that certain modifications be made to the LOI and also discussed a possible monetary settlement.

Accordingly, the real object of the Moving Defendants' various contacts with Michigan was to obtain – or re-establish –  the right to operate a franchise selling Chrysler-branded vehicles.

The Moving Defendants reached out beyond the borders of their own respective home states to create continuing franchise relationships with a company whose principal place of business they knew to be in Michigan.  Such contacts are not "random, fortuitous, or attenuated," but are the result of deliberate conduct that amounts to purposeful availment.

20

2.      The Arising Out Of Requirement:

The second prong of the test is that the cause of action must arise from Defendant's

contacts with the forum state.  The Sixth Circuit has "articulated the standard for this prong in a

number of different ways, such as whether the causes of action were 'made possible by' or 'lie in

the wake of, the defendant's contacts, *Lanier*, 843 F.2d at 909, or whether the causes of action

are 'related to' or 'connected with' the defendant's contacts with the forum state., *Youn v. Track,

Inc.*, 324 F.3d 409, 419 (6th Cir. 2003)."  *Air Prods. and Controls, Inc. v. Safetech Int'l, Inc.*, 503

F.3d 544, 553 (6th Cir. 2007); s*ee also Compuserve, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th

Cir. 1996) ("If a defendant's contacts with the forum state are related to the operative facts of the

controversy, then an action will be deemed to have arisen from those contacts.")

In addition, the Sixth Circuit has "characterized this standard as a 'lenient standard' and

has explained that the cause of action need not 'formally' arise from defendant's contacts."  *Id.*

(citing *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002)).  The Court concludes that this lenient

standard is satisfied here.

Among other things, CG is seeking a declaration that the LOIs it offered dealers who

prevailed in Section 747 arbitrations are CG's "customary and usual" LOIs, as required by

Section 747, and a declaration that Section 747 does not provide for "reinstatement," but instead

provides for the customary and usual letter of intent to be added to CG's dealer network.

The Moving Defendants' contacts with CG in Michigan relating to the LOIs that CG

provided (i.e., signing and returning the LOIs to CG in Michigan and/or negotiating with CG as

to the terms of the LOIs) are clearly related to this cause of action.

In addition, the Moving Defendants' contacts with the forum state of Michigan that "gave

21

rise to" or "relate to" the claims at issue here include their previous, long-term dealer relationships with Old Chrysler.  It is only because the Moving Defendants had each operated under Dealer Agreements with Old Chrysler that they were permitted, under Section 747, to arbitrate with CG and obtain a LOI from CG.  In other words, if the Moving Defendants had not operated under Dealer Agreements with Old Chrysler, they would not have been permitted to seek arbitration with CG under Section 747 and would not be entitled to any LOI from CG.  Thus, this cause of action was "made possible by and would not have existed but for" the Moving Defendants' Dealer Agreements with Old Chrysler.  *Air Prods. and Controls, Inc.*, 503 F.3d at 553.

### 3.    The Reasonableness Requirement:

In determining whether the exercise of jurisdiction is reasonable, the court should consider the following factors: 1) the burden on the defendant; 2) the interest of the forum state; 3) the plaintiff's interest in obtaining relief; and 4) other states' interests in securing the most efficient resolution of the controversy.  *Air Prods. and Controls, Inc.*, 503 F.3d at 554.

Where, as here, the first two prongs are met, "an inference of reasonableness arises" and "only the unusual case will not meet this third criteria."  *Id.*

Moreover, consideration of the factors above does not warrant a finding of unreasonableness.  While it may be burdensome for the Moving Defendants to litigate in Michigan, they knew when they entered into Chrysler franchise agreements, and when they took actions seeking to re-establish Chrysler franchises, that they were making a connection with company headquartered in Michigan.  In addition, Michigan has a strong interest in resolving a dispute involving a corporation that is located in Michigan.

22

Accordingly, the Court shall deny Boucher, Braeger, Sowell, B.G.R. and Jim Marsh's requests to be dismissed from this action for lack of personal jurisdiction.

II.      Challenges Based On Venue:

Defendants Sowell, Deland,  and Jim Marsh each assert that venue is improper in this district.

Venue is governed by 28 U.S.C. § 1391, which provides that a "civil action wherein jurisdiction is not founded solely on diversity" may "be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought." 28 U.S.C. § 1391(b).  If venue is improper, a "district court may, in its discretion, either dismiss the case or transfer it to any other place the case might have been brought." *Bunting ex rel. Gray v. Gray*, 2 Fed.Appx. 443, 448 (6th Cir. 2001).

Here, CG asserts that venue is proper in this district under § 1391(b)(2) because a "substantial part" of the events or omissions giving rise to the action occurred in this district.

Each of the Moving Defendants contends that venue is improper in this district because events giving rise to the claims occurred in each of their respective home states.

Prior to 1990, the venue statute prescribed that venue would lie in *the* judicial district "where the claim arose," rather than in *a* district in which "a substantial part of the events or omissions giving rise to the claim occurred."  *See First of Michigan Corp. v. Bramlet*, 141 F.3d 260, 263-63 (6th Cir. 1998); *Horacek v. Burnett*, 2008 WL 623975 (E.D. Mich. 2008).  The

23

venue statute was amended in 1990 in order to *broaden* the venue provisions. *Id.* The term

"substantial part" as used in the venue statute includes "any forum with a substantial connection"

to the claims. *Id.* Thus, as the Sixth Circuit explained in *Bramlet:*

> "The fact that substantial activities took place in district B does not disqualify
> district A as proper venue as long as 'substantial' activities took place in A, too.
> Indeed, district A should not be disqualified even if it is shown that the activities
> in district B were more substantial, or even the most substantial. Any other
> approach would restore the pinpointing problem that created the difficulties under
> the now discarded 'claim arose' standard. If the selected district's contacts are
> 'substantial,' it should make no difference that another's are more so, or the most
> so."

*Bramlet,* 141 F.3d at 263 (quoting David D. Siegal, *Commentary on the 1988 and 1990 Revisions*

*of Section 1391*)).

As explained in the above section on personal jurisdiction, Michigan has a substantial

connection to the claims in this action. For purposes of whether venue is proper in Michigan, it

is irrelevant that a substantial part of the events giving rise to this action also occurred in other

states. The Court concludes that venue in this district is proper.

III.    Challenges To Subject Matter Jurisdiction:

Defendants Boucher, Braeger, Deland and Jim Marsh challenge subject matter

jurisdiction. These Defendants assert that this Court lacks subject matter jurisdiction over the

claims against them in that: 1) CG does not have standing to bring this action because there is no

actual controversy; and 2) the claims are not ripe.

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases'

and 'controversies.' U.S. Const. art. III, § 2." *National Rifle Assoc. of America v. Magaw*, 132

F.3d 272, 279 (6th Cir. 1997). "In an attempt to give meaning to Article III's 'case or

24

controversy' requirement, the courts have developed a series of principles termed 'justiciability doctrines.'" *Id*. Those doctrines include both standing and ripeness.

    A.    <u>Standing:</u>

"Article III standing requires a litigant to have suffered an injury-in-fact, fairly traceable to the defendant's allegedly unlawful conduct, and likely to be redressed by the requested relief." *Id*.

In this case, CG brings suit under the Declaratory Judgment Act, "which provides the mechanism for seeking pre-enforcement review of a statute." *Id.* Declaratory judgments are typically sought before a completed "injury-in-fact" has occurred, but must be limited to the resolution of an "actual controversy." *Id.* When seeking declaratory relief, a plaintiff "must show actual present harm or a significant probability of future harm in order to demonstrate the need for pre-enforcement review." *Id.* "To determine whether a plaintiff has standing to adjudicate an 'actual controversy,' requisite for relief under the Declaratory Judgment Act, one must ask whether the parties have 'adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment' even though the injury-in-fact has not yet been completed." *Id*. at 280.

The parties' actions and statements establish that CG and the Moving Defendants have adverse legal interests as to the issue of whether Section 747 preempts state dealership acts. For example, in the Florida action, Deland asserts that because it prevailed in its Section 747 arbitration, it is entitled to be "unconditionally" added to CG's roster of dealerships. (D.E. 121-3 at 4). In the Wisconsin action, Boucher & Braeger have asserted, as an affirmative defense, that Section 747 preempts state dealership acts. Boucher & Braeger's brief acknowledges that they

disagree with CG's position regarding the application of the Wisconsin statute to their situation and as to whether Section 747 preempts state dealership acts.  (D.E. 100 at 13).  Similarly, Marsh has also acknowledged that it disagrees with CG's position.  (*See* D.E. 171 at 11) ("Marsh's position is that Section 747 preempts any rights under the Nevada Dealer Act.").  The Court concludes that the parties have adverse legal interests, of sufficient immediacy to warrant the issuance of a declaratory judgment, even though the injury-in-fact has not yet been completed.

     B.     <u>Ripeness:</u>

The basic rationale of the ripeness doctrine is to "prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements."  *National Rifle Assoc. of America,* 132 F.3d at 284.  "Ripeness is, thus, a question of timing."  *Id.*  "A case is ripe for pre-enforcement review under the Declaratory Judgment Act only if the probability of the future event occurring is substantial and of 'sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *Id.*  The Sixth Circuit has instructed that ripeness requires a court to weigh the following factors in deciding whether to address the issues presented for review: 1) the hardship to the parties if judicial relief is denied at this stage of the proceedings; 2) the likelihood that the harm alleged by plaintiff will ever come to pass; 3) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims.  *Id*. at 284.

Here, the Court finds that all three factors weigh in favor of this Court addressing the issues presented for review.

     1.     <u>Hardship To The Parties If Judicial Relief Is Denied At This Stage:</u>

All parties involved – CG, its existing dealers, and the dealers who prevailed in Section

747 Arbitrations – face substantial uncertainty over the application of Section 747 to state dealership acts, and the time and expense associated with pursuing legal proceedings in multiple jurisdictions.

Absent a ruling from this Court, CG will remain in a dilemma: 1) follow the prevailing dealers' position that Section 747 preempts state dealership acts, and allow those who prevailed in Section 747 arbitrations to be added to the CG network without following the requirements of those acts, and subject itself to suit by multiple existing dealers; or 2) follow the existing dealers' position that Section 747 does not preempt state dealership acts, and require the prevailing dealers to follow all provisions of the applicable state dealership act, and subject itself to suit by multiple dealers who prevailed in Section 747 arbitrations.  The very purpose of the Declaratory Judgment Act is ameliorate these kinds of dilemmas.

Moreover, if this Court were to dismiss some or all of the Moving Defendants from this action, CG would be prejudiced in that it would have this Court adjudicate the legal issues against the remaining dealers who prevailed in Section 747 arbitrations, only to have to re-litigate those very same legal issues in separate later actions involving the Moving Defendants.

2.    <u>Likelihood That Harm Alleged By Plaintiff Will Ever Come To Pass:</u>

The Court concludes that CG has established that there is a substantial likelihood that the harm alleged by CG will come to pass, in that there is a substantial likelihood that existing dealers will file protests to the addition of the Moving Defendants as CG dealers.

For each of the dealers who prevailed in a Section 747 arbitration, the process to establishing a CG dealership involves multiple steps, including: 1) the dealer has to prevail in a Section 747 arbitration; 2) CG issues a LOI to that dealer 3) the prevailing dealers executes and

27

returns the LOI to CG; 4) the prevailing dealer notifies CG where the new dealership would be added; 5) CG provides notice to the dealers in that area that a new dealership may be added; and 6) existing dealers in that area may protest the addition, within the time provided for in the relevant dealer act.

Because the Section 747 arbitrations occurred at different times, and the LOI's were issued and executed at different times, and different time lines exists for protesting a dealer under the relevant dealer acts, Defendants are at different phases of the same process. For example, Marsh executed the LOI that CG provided to it, and CG advised the dealers in that area that a dealer may be added. One of the existing dealers in Marsh's market area has already filed a protest against Marsh being added a dealer. Sowell is at a different stage of the process. Because Sowell did not accept or execute the LOI that CG provided to it, the dealers in the area it wishes to be located in have not yet received notice that a new dealer may be located in that area and thus, they have not yet filed a protest.

Old Chrysler sought to reduce its dealer network because it believed that it had too many dealers competing for declining vehicle sales. Existing dealers have a strong financial incentive to oppose other dealers being added in their existing markets. CG fully anticipates – and the Moving Defendants do not appear to dispute – that it is highly likely that at least one existing dealer will protest each of the Moving Defendants once they are given notice of the potential new dealer.

The Court finds that the probability of the future event occurring is substantial and of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

3.      Whether The Factual Record Is Sufficiently Developed:

The Court also finds that whether or not Section 747 preempts state Dealer Acts presents "a straightforward, concrete question of statutory interpretation, the answer to which is not dependent on further development of facts." *School Dist. of City of Pontiac v. Secretary of U.S. Dept. of Educ.*, 584 F.3d 253, 263 (6th Cir. 2009). That is, the Court needs no further factual development before deciding threshold legal issues, such as whether Section 747 preempts state dealership acts. Indeed, for this very reason, this Court stayed discovery until after such threshold legal issues are decided.

IV.    Challenges Based On Failure To Join A Party:

Defendants Boucher and Braeger assert that CG has failed to join necessary parties under FED. R. CIV. P. 19(a). That rule provides, in pertinent part:

> (a) **Persons Required to Be Joined if Feasible.**
>     (1) **Required Party.** A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>     . . .
>         (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>         . . .
>             (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

FED. R. CIV. P. (a)(1)(B)(ii).

Boucher and Braeger assert that CG's claims against them "affect whether three other Wisconsin dealers (Palmen, Griffin and Ewald) can block [CG] from adding Boucher & Braeger to its dealer network pursuant to the federal Act by protesting those additions under the

29

Wisconsin motor vehicle dealer law. [CG] seeks a declaratory judgment that the federal Act does not preempt the Wisconsin motor vehicle dealer law even if it allow such protests." (Docket Entry No. 100 at 16). They assert that "[i]f this Court has personal jurisdiction over Boucher and Braeger, then it has personal jurisdiction over Palmen, Griffin and Ewald, which are more likely to be subject to jurisdiction in this district because of their existing franchise relationship with [CG]." *Id.* They claim that "[u]nless Palmen, Griffin and Ewald are made parties to this litigation, any judgment rendered by this Court will not be binding upon them, and they will be free to litigate the issue of Section 747's preemption of Wis. Stat. § 218.0116(7)(a) in a different forum, thus exposing Boucher and Braeger to the potential for multiple litigation and inconsistent results." *Id.* at 17. Boucher and Braeger request that this Court either dismiss the claims against them or order that Palmen, Griffin and Ewald be made parties to this action pursuant to FED. R. CIV. P. 19(a).

In response, CG does not dispute that Palmen, Griffen and Ewald are the three existing dealers who could protest the addition of Boucher and Braeger or that they have an interest in this action. CG also appears to agree that this Court has personal jurisdiction over those three dealers. CG, however, opposes the motion, asserting that Palmen, Griffin, and Ewald "would *likely* be collaterally estopped from re-litigating this Court's ruling." (D.E. 125 at 15) (emphasis added).

Boucher and Braeger disagree as to whether collateral estoppel would apply and, understandably, do not wish to take a risk as to its application.

The Court shall order CG to add Palmen, Griffin, and Ewald as parties to this action within fourteen (14) days of this Opinion & Order and order that, if they fail to do so, the Court

shall dismiss Boucher and Braeger from this action.

V.      Challenges Based On Insufficient Service Of Process:

Sowell is the only Defendant that challenges service of process.  Sowell addresses this

argument in one paragraph of its brief:

> It is well settled that in California, substitute service pursuant to C.C.P. Section
> 415.20(a) may be affected by delivering a copy of the Summons and Complaint
> during usual business hours with the person apparently in charge and thereafter
> mailing a copy of the Summons and Complaint via first class mail to the person to
> be served at the place where the copy was left.  Service in this manner is deemed
> completed on the 10th day after mailing.  The Affidavit of Service filed by [CG]
> with respect to Sowell on 10/19/201, Document 7 on the docket for Case No. 10-
> 13908, states that the Summons and First Amended Complaint were left with the
> Receptionist; no mention of a follow up mailing is made and no personal service
> on Sowell's designated agent, Kent B. Sowell was made or attested to. [CG]'s
> Complaint should be dismissed for insufficient service of process.

(Sowell's Br. at 9-10).

In response, CG states that it properly served Sowell under FED. R. CIV. P. 4(h)(1)(B),

which provides that a corporation may be served by "delivering a copy of the summons and of

the complaint to an officer, a managing or general agent, or any other agent authorized by

appointment or by law to receive service of process and – if the agent is one authorized by statute

and the statute so requires – by also mailing a copy of each to the defendant."  FED. R. CIV. P.

4(h)(1)(B).  CG states, and it has attached a Declaration by the process server so stating, that the

process server brought the summons and complaint to the Sowell dealership and that the

"receptionist was instructed by Kent B. Sowell, via intercom, to accept the documents on his

behalf because he is busy and therefore not available to step forward and accept in person."

(Docket Entry No. 126-10).  The process server's Declaration further states that she handed the

documents to the receptionist who had been authorized to accept service.

CG's brief cites numerous cases that support its position that a receptionist may accept service where, as here, she has been authorized to do so by a registered agent. *See, e.g., Direct Mail Specialists, Inc. v. Eclat Computerized Tech., Inc.,* 840 F.2d 685, 688-89 (9th Cir. 1988). CG also asserts that no mailing was required under FED. R. CIV. P. 4(h)(1)(B) because the person who was so appointed (i.e. Sowell's receptionist) was not an agent authorized by statute.

The Court agrees that service was proper. Based on the process server's unchallenged affidavit, Kent B. Sowell, Sowell's registered agent, verbally authorized his receptionist to accept service.

### CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Boucher & Braeger's Motion to Dismiss (D.E. 100) is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED to the extent that the Court concludes that Defendants Boucher and Braeger have shown that three existing non-party dealers (Palmen, Griffin, and Ewald ) are necessary parties to this action and that CG shall either add them as parties within 14 days or dismiss Boucher and Braeger from this action. Boucher & Braeger's motion is DENIED IN ALL OTHER RESPECTS.

IT IS FURTHER ORDERED that the Motions to Dismiss filed by Defendants Sowell (D.E. 111), Deland (D.E. 121), and Jim Marsh (D.E. 156) are DENIED.[3]

---

[3]To the extent that any of these Motions to Dismiss asked this Court to transfer venue pursuant to 28 U.S.C. § 1404(a), those requests are denied without prejudice. (*See* Order Clarifying Early Motion Practice, D.E. 118).

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  May 10, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 10, 2011, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager

33